1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   EVELYN M. BYBEE,

11             Plaintiff,                          CIV S-10-3264 GGH

12        vs.

13   MICHAEL J. ASTRUE,                            ORDER
     Commissioner of Social Security,
14
               Defendant.
15   _____/

16             Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying her application for Supplemental Security Income ("SSI")

18   under Title XVI of the Social Security Act ("Act").   For the reasons that follow, Plaintiff's

19   Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary

20   Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

21   BACKGROUND

22             Plaintiff, born June 2, 1958, applied on January 11, 2007 for disability benefits,

23   with a protective filing date of December 22, 2006.  (Tr. at 16, 93.)  Plaintiff alleged she was

24   unable to work since 1995 due to migraines, COPD, arthritis, heart valve, and depression.  (Id. at

25   \\\\

26   \\\\

                                                  1

109.)  In a decision dated October 26, 2009, ALJ Bernard McKay determined that plaintiff was

not disabled.  (Id. at 16-23.)   The ALJ made the following findings:[1]

      1.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

      2.      The claimant's migraine headaches, depression, asthma/chronic obstructive pulmonary disorder (COPD) and injuries to her cervical spine are considered "severe" based on the requirements in the Regulations (20 CFR 416.920(c)).

      3.      These medically determinable impairments do not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.

      4.      The claimant's allegations regarding her limitations are not totally credible, for the reasons set forth in the body of the decision.

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

      Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

      Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

      Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

      Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

      Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

      The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

5.      The claimant retains the residual functional capacity for a limited range of "light" exertional work as defined in 20 CFR 416.967, including the ability to lift and carry ten pounds frequently and twenty pounds occasionally. However [she] can only occasionally bend, kneel, crawl, and balanc[e]; she can never climb ladders, ropes or scaffolds; she cannot reach overhead although she can reach up to shoulder level with no limitation; she must work in a temperature-controlled environment with no concentrated exposure to fumes, odors, dust, and smoke; and she also is limited to simple, non-complex instructions involving one or two steps.

6.      The claimant cannot perform past relevant work (20 CFR §§ 404.1568 and 416.968).

7.      The claimant is an individual "closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

8.      The claimant has a high-school education.  (20 CFR §§ 404.1564 and 416.964).

9.      The claimant has an unskilled work history.

10.     Although the claimant's exertional limitations do not allow her to perform the full range of medium work, using Medical-Vocational Rule 203.13[2] as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as a[n] electronics worker, of which there are approximately 285,000 jobs in the national economy and 1,540 jobs in the Oregon economy; or a bindery machine feeder, of which there are approximately 165,000 jobs in the national economy and 1,300 jobs in the Oregon economy.

11.     The claimant has not been under a "disability" as defined in the Social Security Act, at any time from the alleged onset date through the date of this decision (20 CFR § 416.920(f)).

(Tr. at 22-23.)

\\\\

---

[2]  The citation to Rule 203.13 (medium work) appears to be a typographical error as the ALJ specifically found that plaintiff could do a limited range of light work and specifically referred to Rule 202.13 in the body of his decision.  (Tr. at 22.)

1  ISSUES PRESENTED

2          Plaintiff has raised the following issues: A.  Whether the ALJ Erred in Failing to

3  Find Plaintiff Disabled Under the Grids; B.  Whether the ALJ Improperly Rejected the Opinions

4  of Plaintiff's Treating Physician; C.  Whether the ALJ Rejected Plaintiff's Subjective Testimony

5  Without Providing Specific Findings and Clear and Convincing Reasons; D. Whether the ALJ

6  Improperly Substituted His Own Opinion for Plaintiff's Treating Physicians and other Examining

7  Physicians; E.  Whether the ALJ Failed to Properly Consider the Combined Effects of Plaintiff's

8  Multiple Impairments; and F.  Whether the ALJ Erred by Basing his Decision on an Incomplete

9  Hypothetical to the Vocational Expert Which did not Accurately Reflect Plaintiff's Condition,

10  and Disregarding the Expert's Answer Concerning Plaintiff's Actual Condition.

11  LEGAL STANDARDS

12          The court reviews the Commissioner's decision to determine whether (1) it is

13  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

14  the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

15  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

16  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

17  as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

18  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

19  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

20  ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

21  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

22  rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

23  ANALYSIS

24     A.  Failure to Credit the Opinions of Treating and Examining Specialists

25          Plaintiff first contends that the ALJ improperly rejected the opinion of plaintiff's

26  treating physician, Dr. Heard, specifically the records contained in Exhibit 18F.  Plaintiff also

4

claims that the ALJ improperly substituted his own opinion for that of Dr. Heard and other

treating and examining physicians, making his own independent findings and speculative

inferences from the evidence.

The weight given to medical opinions depends in part on whether they are

proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3]  Ordinarily,

more weight is given to the opinion of a treating professional, who has a greater opportunity to

know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to

considering its source, the court considers whether (1) contradictory opinions are in the record;

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of

a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester ,

81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may

be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

---

[3]  The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

1  2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and

2  supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

3  (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

4  881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

5  insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

6         Here, the ALJ stated that he was according Dr. Heard weight but only to the

7  extent this treating physician's opinion was consistent with the residual functional capacity

8  determined in the opinion.  In other words, the ALJ rejected Dr. Heard's RFC assessment, dated

9  January 9, 2009, because it was extremely limited and thus inconsistent with and unsupported by

10 the remainder of the medical evidence and the record as a whole.  (Tr. at 21.)  Instead, the ALJ

11 appeared to rely on the non-examining state agency physicians, whose opinions the ALJ found

12 were consistent with and supported by the record.  (Id.)  In reality, the ALJ relied on Dr. Heard's

13 other records, and the reports of other examining physicians to come to his decision.

14         Dr. Heard, in his RFC of January, 2009, opined that based on her cervical and

15 lumbar disc disease and spondylosis, plaintiff's prognosis was guarded.  The objective evidence

16 supporting his opinion was limited range of motion in the spine and extremities, and imaging

17 reports reflecting degenerative changes.  Plaintiff had only a limited response to medications,

18 which caused side effects such as drowsiness, dizziness and lack of coordination.  (Id. at 411.)

19 Adding to these physical diagnoses was plaintiff's depression and anxiety.  As a result, this

20 treating physician found plaintiff incapable of even low stress work.  He thought her pain and

21 other symptoms would interfere constantly with her attention and concentration.  In regard to her

22 physical abilities, Dr. Heard opined that she could only walk half a block before she would have

23 to rest.  (Id. at 412.)  She could only sit for fifteen minutes, stand for fifteen minutes, and stand

24

_____

25     [4] The factors include: (1) length of the treatment relationship; (2) frequency of
   examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26 (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

and walk for two hours total in an eight hour work day.  (Id. at 412-13.)  Plaintiff would be able to walk every fifteen minutes for three minutes at a time, she would need to change positions at will and take unscheduled breaks about every fifteen minutes for three to five minutes.  He also thought that plaintiff would need an assistive device to stand and walk.  Plaintiff could only lift ten pounds rarely and could never lift more than that.  (Id. at 413.)  She could rarely look down, turn her head sideways, and could never hold her head in a static position.  She could look up occasionally.  She could never crouch or climb ladders, rarely climb stairs and stoop, but could occasionally twist.  He estimated that she would have to miss more than four days of work per month.  (Id. at 414.)

The ALJ's references to the remainder of the record to support his rejection of Dr. Heard's RFC include citation to Dr. Sowerby's April 18, 2006 exam.  In this regard, the ALJ notes that lungs were clear, there was no lordosis, kyphosis, scoliosis, masses, significant muscle spasms or tenderness to palpation, in the lumbar spine.  With respect to the cervical spine, there was limitation in range of motion, and significantly in extension and bilateral rotation.  There was also tenderness to palpation.  (Id. at 230.)  The diagnosis at this time was degenerative disc disease and bilateral uncovertebral hypertrophy at C6-7, chronic headaches/bilateral occipital neuralgia, and myofascitis.  (Id. at 226.)  The plan based on this exam was to give plaintiff a booster cervical steroid block at C6-7.  (Id. at 231, 225.)

The ALJ also relied on other reports by Dr. Heard, including a January 12, 2007 exam wherein this treating doctor diagnosed spondylosis, sciatica and cephalgia.  (Id. at 17, 242.)  Plaintiff reports better relief from the migrainous cephalgia with Imitrex.  At this time, plaintiff complained of intermittent pain down the back of her right leg, but denied weakness.  Plaintiff's neck pain had also improved by taking Cymbalta.  (Id. at 242.)

The ALJ also noted Dr. Riger's consultative exam, dated March 27, 2007, in which he diagnosed depression, chronic neck pain, dyspepsia, migraines, arthritis, asthma, possible prolapsed mitral valve, and paresthesias.  (Id. at 19, 302.)  The ALJ specifically

referenced this internist's notes that plaintiff's neck pain was improved with the cortisone

injection, and that she could write well despite "burning" pain radiating down her arm.  (Id. at 19,

302.)  Plaintiff mentioned wanting to stop taking medication for depression because she was

doing well, but did not think it was a good time.  Plaintiff's asthma was under "fairly good

control" at this time.  (Id. at 19, 300.)  Although plaintiff reported that her biggest problem was

her neck, Dr. Riger noted that her neck was supple with no adenopathy or thyromegaly, and she

could flex her neck 15 degrees, extend 10 degrees, and bend 15 degrees in each direction.  (Id. at

301.)  Neurologic exam indicated "motor 5/5 throughout.  Reflexes symmetric.  Sensation is

diminished to light touch in the right upper extremity, in the right thumb, and second finger,

otherwise intact."  (Id. at 19, 302.)  Dr. Riger opined that plaintiff could lift and carry twenty

pounds frequently, stand and/or walk for less than two hours in a work day, sit for either six

hours or less than six hours in a work day,[5] would not need to alternate sitting and standing,

could occasionally climb, balance, kneel, crouch, and never stoop, crawl, reach, handle, or finger.

(Id. at 303-04.)

        The ALJ's analysis was additionally based on the state agency report of Dr.

Nguyen, dated April 18, 2007, which concluded that plaintiff could occasionally lift 20 pounds,

frequently lift ten pounds, stand and/or walk for six hours in a work day, sit for six hours,

frequently push or pull, occasionally climb, balance, stoop, kneel, crouch and crawl, and that

reaching and feeling were limited.  (Id. at 19-20, 311-12.)

        In addition to the aforementioned records which support the ALJ's rejection of Dr.

Heard's RFC, Dr. Heard's own records refute his RFC assessment.  On May 19, 2009, he noted

that plaintiff walked unassisted in her physical exam, contrary to his January 9, 2009 RFC report

wherein he states that plaintiff must use an assistive device.  (Id. at 413, 435.)  See also tr. at 405,

439, 443 (Dr. Heard's notations that plaintiff was in no apparent distress and walked unassisted.)

---

    [5]  The check mark on the form appears to be placed between the boxes for six hours and
less than six hours.  (Id. at 304.)

1  Also, the most recent medical report by Dr. Heard, dated May, 2009, indicates that plaintiff gave

2  a normal respiratory effort, that her lungs were clear, and she had good air exchange.  (Id. at

3  435.)  Although plaintiff's range of motion in her neck was found to be severely limited, Dr.

4  Heard deferred referring plaintiff for epidural blocks or facet joint injections based on her

5  adequate response to medical treatment.  (Id. at 435, 437.)  The lumbar spine was only

6  moderately limited and the extremities were normal.  Plaintiff's mental status was normal, with

7  normal judgment and insight, and no mood disorders.  (Id. at 435.)  Dr. Heard's records also

8  reflected that plaintiff on August 27 and November 26, 2008, had reported improved function, no

9  medication side effects, and no sleep disturbance from pain.  (Id. at 405, 443.)

10          The medical evidence concerning plaintiff's depression and anxiety also refuted

11  Dr. Heard's RFC assessment that plaintiff was incapable of even low stress jobs.  (Id. at 412.)

12  The opinions of Drs. Kemp and Klein in this regard were specifically outlined by the ALJ.  The

13  ALJ first noted that Dr. Kemp's April 17, 2007 consultative psychological examination revealed

14  that plaintiff had a good prognosis with appropriate treatment.  (Id. at 20.)  He then summarized

15  Dr. Kemp's opinion that plaintiff could do simple and repetitive tasks, and that she was only

16  moderately impaired in doing complex tasks, doing work in a safe manner, maintaining social

17  functioning, and dealing with changes in a routine work setting.  Plaintiff was only mildly

18  impaired in maintaining regular workplace attendance and interacting appropriately with

19  supervisors, coworkers and the public.  (Id.)

20          The ALJ then reviewed Dr. Klein's non-examining mental RFC assessment, dated

21  June 15, 2007, noting moderate difficulties in maintaining social functioning and in maintaining

22  concentration, persistence and pace.  Plaintiff was found to have adequate memory and

23  understanding, and could maintain a sustained concentration, persistence and pace to perform

24  "simple 1-2 step tasks."  Plaintiff was also found to be adequate in social interaction in work

25  environments not dealing with the public, and could adapt to changes in most work settings.  (Id.)

26  The summarization of these assessments constituted specific and legitimate reasons to reject Dr.

9

1    Heard's opinion regarding plaintiff's mental limitations.

2              In addition to the medical records, the ALJ discussed plaintiff's quite active daily

3    activities in order to refute the very restrictive functional capabilities assessed by Dr. Heard.  He

4    specifically stated:

5              [Plaintiff] also testified to activities inconsistent with a disabling
             level of impairment, including household chores such as doing
6              dishes and laundry, cleaning the house, and watching over her
             boyfriend's five-year-old son, as well as performing occasional odd
7              jobs, watching television, sending text messages on her cellular
             telephone, and playing games such as Yahtzee and dice.  And
8              although she stated that she doesn't drive anymore due to her fear
             of losing her grip, she did note her ability to use the bus for
9              transportation.  During her April 2007 psychological examination,
             the claimant reported that she could stand for up to an hour to cook
10             items like hamburgers, spaghetti, and bacon and eggs; as well as
             going grocery shopping and attending her son's soccer games.

11

12   (Id. at 18-19.)

13             The complete record was fully summarized by the ALJ who thoroughly reviewed

14   all of the evidence.  The fact that he did not state the reasons in the same part of the opinion

15   where he rejected Dr. Heard's RFC assessment is not error because he thoroughly laid out the

16   reasons in his opinion leading up to that rejection.  See Tr. at 18-21.  This is not a case where the

17   ALJ's decision is affirmed based on reasoning he did not cite.  See Stout v. Commissioner, 454

18   F.3d 1050 (9th Cir. 2006).

19             Furthermore, the ALJ could properly reject Dr. Heard's RFC assessment where

20   his other records did not support the degree of severity assessed in this one report.  The ALJ is

21   free to rely on whatever evidence he chooses, even though reliance on other evidence would have

22   caused him to reach the opposite conclusion.  Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).

23   Furthermore, an ALJ may properly rely upon only selected portions of a medical opinion while

24   rejecting other parts.  See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's

25   supported reliance on selected portions of conflicting opinion constitutes substantial evidence).

26   However, such selective reliance must be consistent with the medical record as a whole.  See,

10

1    e.g., Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ cannot reject portion of

2    medical report that is clearly reliable).  Here, the ALJ's reliance on only portions of Dr. Heard's

3    records was consistent with the remainder of the record.

4              The ALJ can fulfill his obligation to provide specific and legitimate reasons to

5    reject a treating physician by "setting out a detailed and thorough summary of the facts and

6    conflicting clinical evidence, stating his interpretation thereof, and making findings."  Flesher v.

7    Astrue, 2011 WL 2144622, *3 (D. Ariz. June 1, 2011), quoting Embrey v. Bowen, 849 F.2d at

8    418, 421 (9th Cir. 1988).

9              The ALJ's rejection of Dr. Heard's RFC based on its inconsistency with the

10   remainder of the record was not error.  Inconsistency with medical evidence or with the record as

11   a whole is a specific and legitimate reason for rejecting treating physician's opinion.  Batson v.

12   Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).   Moreover, Dr. Heard's

13   opinion of disability (Tr. at 411-15[6]), is not binding on this court.  "A statement by any physician

14   that the claimant is disabled or unable to work is a conclusion on the ultimate issue to be decided

15   . . . and is not binding on the [ALJ] in reaching his determination as to whether the claimant is

16   disabled within the meaning of the [Act]."  Murray v. Heckler, 722 F.2d 499 (9th Cir. 1983),

17   (citing Burkhart v. Bowen, 856 F.2d 1335 (9th Cir. 1988), 20 C.F.R. §§ 404.1527 and 404.927);

18   accord, Magallanes v. Bowen, 881 F.2d 747, 750-51 (9th Cir. 1989).

19             Plaintiff takes issue with the ALJ's reliance on the opinions of non-examining

20   sources; however, the ALJ relied on examining consultants Riger, Kemp, Sowerby, and portions

21

22        [6]  The statement of disability in the RFC is based to a large extent on plaintiff's
     complaints.  For example, plaintiff reported the following to Dr. Heard: "pain, dizziness, fatigue,
23   sleeplessness, muscle cramps, loss of balance, weariness, headaches & loss of bladder control,"
     arthralgias made worse by inclement weather, hip & spine, occur daily and may be severe," and
24   "limited response to polypharmacy w/adverse reactions of drowsiness, dizziness &
     incoordination [sic]."  (Tr. at 411.)  See Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir.1995)
25   ("an opinion of disability premised to a large extent upon the claimant's own accounts of his
     symptoms and limitations may be disregarded, once those complaints have themselves been
26   properly discounted").  The ALJ found plaintiff to be not entirely credible.  That issue is
     contested and will be addressed infra.

11

1   of Dr. Heard's records.  The assessments of non-examining physicians were considered to the

2   extent they supported the evidence of the examining physicians, which do constitute substantial

3   evidence.

4           In sum, the ALJ properly rejected Dr. Heard's RFC assessment, and his reliance

5   on the remainder of the record is based on substantial evidence.

6           B.  Whether the ALJ Failed to Credit Plaintiff's Testimony

7           Plaintiff contends that the ALJ rejected her credibility without clear and

8   convincing reasons.

9           The ALJ determines whether a disability applicant is credible, and the court defers

10  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

11  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

12  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

13  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

14  supported by "a specific, cogent reason for the disbelief").

15          In evaluating whether subjective complaints are credible, the ALJ should first

16  consider objective medical evidence and then consider other factors.  Vasquez v.  Astrue, 572

17  F.3d 586, 591 (9th Cir. July 8, 2009); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en

18  banc).  The ALJ may not find subjective complaints incredible solely because objective medical

19  evidence does not quantify them.  Bunnell at 345-46.  If the record contains objective medical

20  evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature

21  of the alleged symptoms, including aggravating factors, medication, treatment, and functional

22  restrictions.  See Vasquez, 572 F.3d at 591.  The ALJ also may consider the applicant's: (1)

23  reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately

24  explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily

25  \\\\

26  \\\\

1   activities.[7] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61

2   FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party

3   testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony

4   and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792

5   (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han

6   v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.

7   Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that

8   her impairment "could reasonably have caused some degree of the symptom." Vasquez, 572

9   F.3d at 591 (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80

10  F.3d at 1282).  Absent affirmative evidence demonstrating malingering, the reasons for rejecting

11  applicant testimony must be specific, clear and convincing.  Vasquez, 572 F.3d at 591.

12          Plaintiff's credibility was properly questioned for the reasons pointed out by the

13  ALJ.  He first noted that although plaintiff had alleged disability since 1995 in her application,

14  she conceded she had looked for work since that time, and as late as 2002.  (Id. at 18.)  The act of

15  looking for work reflects plaintiff's mind-set that she thought she was well enough to work as of

16  2002, not that she may have been looking for part time work as she now suggests.  The ALJ next

17  discussed plaintiff's daily activities, which included the numerous activities outlined in the

18  previous section, such as cleaning, taking care of a five year old, cooking for an hour and grocery

19  shopping, to name a few.  (Id. at 19.)  This level of functioning was not only testified to by

20  plaintiff, but she also reported these same activities to Dr. Kemp.  (Id. at 34, 36, 38, 308.)

21          The ALJ then noted that plaintiff's physical impairments did not substantiate her

22  claimed limitations.  For example, plaintiff's asthma was stable, and in April, 2006 in particular

23

24          [7] Daily activities which consume a substantial part of an applicants day are relevant.
    "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
    activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
25  any way detract from her credibility as to her overall disability.  One does not need to be utterly
    incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
26  (quotation and citation omitted).

she denied "shortness of breath, wheezing, dyspnea on exertion, orthopnea, chronic cough, or hemoptysis." (Id.) The records support this characterization. See e.g. tr. 230 ("lungs are clear to auscultation bilaterally with no wheezes, rhonchi or rales noted. The chest is symmetrical with normal expansion"), tr. 301-02 (diagnosis of asthma but lungs were clear), 242 ("free from respiratory distress"). In fact, Dr. Heard specifically noted that plaintiff continued to smoke cigarettes, despite advice to quit, which clearly contributed to her asthma and COPD.[8] (Id. at 242-43, 246, 249, 255.) This failure to follow a prescribed course of treatment can be considered in regard to plaintiff's credibility. Smolen, 80 F.3d at 1284. Smoking despite medical advice to quit is relevant to the credibility analysis, as is evidence of successfully quitting smoking for significant periods. Eldred v. Commissioner of Social Sec. Admin., 2011 WL 5999876, *13 (D. Or. 2011) (citing cases). Furthermore, presently treatable conditions are not susceptible to being characterized as a long term disability. Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967) (smoking case); Fletcher v. Califano, 471 F.Supp. 317 (N.D. Texas 1977) (smoking case).

> Failure to quit smoking has been held to be a justifiable grounds for refusing benefits. E.g., Henry v. Gardner, 381 F.2d 191 (6th Cir.1967); Hirst v. Gardner, 365 F.2d 125 (7th Cir.1966). However, some recent cases have held that benefits cannot be denied for failure to stop smoking absent a finding that the claimant could voluntarily stop smoking (i.e., was not addicted to cigarettes). Monteer v. Schweiker, 551 F. Supp. 384, 390 (W.D.Mo.1982); Caprin v. Harris, 511 F. Supp. 589, 590 (N.D.N.Y.1981). Smoking, like alcohol abuse, can be an involuntary act for some persons. We believe that allegations of tobacco abuse should be treated in the same fashion as allegations of alcohol abuse.

Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984).

The court held that on remand, benefits could only be denied if there was a finding that a physician had prescribed cessation of smoking, and the claimant was able to voluntarily stop. (Id.) See also Byrnes v. Shalala, 60 F.3d 639 (9th Cir. 1995) (noting that before

_____

[8] Although plaintiff also admitted to smoking two to three bowls of marijuana per day, it is not clear whether this drug contributes to asthma. (Tr. at 229.)

ALJ can deny benefits for noncompliance with prescribed treatment such as smoking, he must

consider whether impairment is reasonably remediable by the individual claimant).

Therefore, although it is questionable whether plaintiff could voluntarily stop

smoking, there is no question that her shortness of breath could be treated with bronchodilators

and other medication.

The ALJ next supported his credibility analysis with referral to plaintiff's denial

of "syncope, focal weakness, seizures, vertigo, neurasthenias, or paresthesias," as verified in Dr.

Sowerby's records.  (Id. at 19, 229.)  Also mentioned was plaintiff's report that she had no new

symptoms of "depression, suicidal ideation, suicidal plans or other psychological changes."  She

also had no "shortness of breath, wheezing, dyspnea on exertion, orthopnea, chronic cough or

hemoptysis." (Id.)  The ALJ then referred to Dr. Sowerby's exam of the spine in stating that

there was no "abnormal lordosis, kyphosis, scoliosis and no masses, significant muscle spasms,

or tenderness to palpation."  The ALJ also discussed her intact sensation and motor strength in

the lower extremities, and strength in both arms.  (Id. at 19, 230.)

The ALJ then reviewed the medical reports of Drs. Riger, Nguyen, Kemp and

Klein, as outlined in the previous section.   He also addressed plaintiff's depression fully, noting

the lack of significant or ongoing functional limitations resulting from this impairment.  (Id. at

20.)  In addition to those records summarized above, the ALJ also noted Dr. Kemp's opinion that

although plaintiff had major depressive disorder, her GAF score of 55 indicated only moderate

symptoms.  The ALJ stated that "Dr. Kemp's examination revealed no loose associations,

circumstantial thinking, paranoia, delusions, preoccupations, hallucinations, or perceptual

disturbances.  The claimant was oriented to person, place, and time, with 'low average

concentration' and problems with short-term memory but good insight and judgment." (Id. at

20.)  The ALJ concluded that when the aforementioned records are considered along with

plaintiff's activities, some degree of pain is reasonable; however, the severity of pain alleged is

not corroborated by the medical evidence and the entirety of the record, which reflects that

1  plaintiff can walk, stand, sit, and lift and carry, as well as perform the basic mental functions

2  consistent with sustained work.  (Id.)

3          Plaintiff contends that daily activities do not indicate an ability to work for eight

4  hours a day; however, this is one factor which may be considered in determining credibility.

5  Smolen, 80 F.3d at 1284.

6          Plaintiff also contends that the ALJ relied on isolated records which supported his

7  position that plaintiff was stable or improved.  The undersigned has reviewed the treating records

8  as a whole, which support the ALJ's reliance.  See tr. at 242-299, 435-52.  Furthermore, these

9  records indicate that plaintiff's condition was not severe enough to warrant any diagnostic

10  studies, physical therapy, or the type of pain medications used for severe pain.  In fact, plaintiff's

11  treatment was very conservative, including a couple of cervical epidural steroid blocks in 2005

12  and 2006, after which plaintiff reported improvement.  (Tr. at 207, 226, 257.)  Another booster

13  block was considered in 2008; however, in 2009, Dr. Heard wrote, "given the adequate response

14  to medical treatment, deferred referring the pt. to the anesthesiologist to discuss steroid epidural

15  blocks or facet joint injections."  (Id. at 437.)

16          On July 7, 2006, plaintiff reported that her need for an asthma inhaler has

17  diminished since she started taking Claritin.  Plaintiff had suffered from asthma since age 36.

18  Plaintiff reported that she did not use an assistive device, contrary to Dr. Heard's

19  recommendation that she needed one in his RFC.  (Id. at 254, 413.)  On September 13, 2006,

20  plaintiff reported that her headache symptoms had improved with Cymbalta, and her former

21  nausea had disappeared.  As a result, she less often requested Tylenol with ½ grain codeine.

22  Plaintiff was taking Elavil, Seroquel, Klonopin, Soma, and Imitrex.  (Id. at 249.)  On November

23  10, 2006, plaintiff used a TENS unit for her neck pain.  At this time, she was taking Tylenol with

24  ½ grain of codeine three times per day, for a total of 4,000 mg of Tylenol per day, as well as

25  Soma. (Id. at 245.)  Dr. Heard noted that the last CT scan of the cervical spine was on March 3,

26  2005, and it was abnormal.  (Id. at 245.)  The only more recent CT scan was of the lumbar spine

1  only, and was dated May 20, 2008.  It showed "severe R-sided L5-S1 stenosis neural foramen

2  w/disc bulging and mild facet hypertrophy.  (Id. at 444.)  It is unclear why there was not a more

3  recent CT scan of the cervical area, since neck pain appeared to be plaintiff's primary ailment.

4  There are no other diagnostic studies of the neck.  Nor are there any recommendations for

5  physical therapy, surgery or other more aggressive treatment.  On January 12, 2007, plaintiff was

6  given Cymbalta samples for her headaches and neck pain.  (Tr. at 242, 244, 249.)  No other

7  treatment was prescribed.  In regard to plaintiff's migraine headaches, plaintiff reported that she

8  has suffered from them since age nine, (tr. at 251); however, her work history belies any claim

9  that they prevented her from holding a job.

10         The ALJ gave clear and convincing reasons in support of his credibility analysis,

11  which is supported by the record.

12        C.  Combined Effects of Plaintiff's Impairments

13         Plaintiff next contends that the ALJ failed to "consider the combined effect of

14  plaintiff's multiple impairments, physical and mental, severe and non-severe, as to whether the

15  combined effect should be regarded to be of sufficient severity, without regard to whether any

16  impairment considered separately would be of sufficient severity."  (Pl.'s Mot. at 5.)  Plaintiff

17  has failed to set out a separate section for this argument, but repeats this proposition one time in

18  passing, in her brief.  (Tr. at 21.)  Rather than argue that the combined effects of various

19  conditions may demonstrate the "equivalent" of the specific required findings to meet a listing,

20  see, e.g., Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990),

21  plaintiff makes only conclusory statements that her physical and mental impairments, when

22  considered together, render her unable to perform substantial gainful activity.  Plaintiff has not

23  sufficiently raised an issue in this regard.  Bare contention, unsupported by explanation or

24  authority, may be deemed waived.  See Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1502

25  (9th Cir. 1996) (party who presents no explanation in support of claim of error waives issue).

26  The court will not deem the contention waived, but finds it without for the following reasons.

1    First, plaintiff makes no contention that she meets or equals a listed impairment; however, the

2    ALJ did properly consider whether plaintiff met listing 12.04 and 1.04 of the Listing of

3    Impairments.  (Tr. at 18.)  Second, the ALJ did consider plaintiff's limitations in combination

4    when he posed a hypothetical to the vocational expert which included preclusions from climbing

5    and reaching overhead, environmental controls for her asthma, and limitation to simple, non-

6    complex one or two step instructions to account for her mental limitations.  (Id. at 23.)  See

7    further discussion infra.  Without any argument whatsoever by plaintiff, the undersigned is

8    unable to further address this issue.

9            D.  ALJ's Use of the Grids

10                   Plaintiff next argues that she should have been found disabled under Rule 201.12

11   of the grids.

12                   The Guidelines in table form ("grids") are combinations of residual functional

13   capacity, age, education, and work experience.  At the fifth step of the sequential analysis, the

14   grids determine if other work is available.  See generally Desrosiers v. Secretary of Health and

15   Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

16                   The grids may be used if a claimant has both exertional and nonexertional

17   limitations, so long as the nonexertional limitations do not significantly impact the exertional

18   capabilities.[9]  Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds,

19   Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  The ALJ, however, is not

20   automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional

21

22        [9]  Exertional capabilities are the "primary strength activities" of sitting, standing, walking,
     lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary;
23   Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include
     mental, sensory, postural, manipulative and environmental matters which do not directly affect
24   the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper,
     880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).  "If a claimant has
25   an impairment that limits his or her ability to work without directly affecting his or her strength,
     the claimant is said to have nonexertional (not strength-related) limitations that are not covered
26   by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

18

1   limitation.  <u>Desrosiers</u>, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged

2   does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, §

3   200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience,

4   education, and psychological and physical impairments to determine whether a nonexertional

5   limitation significantly limits plaintiff's ability to work in a certain category.  <u>Desrosiers</u> 846

6   F.2d at 578 (Pregerson, J., concurring).  "A non-exertional impairment, if sufficiently severe,

7   may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such

8   a case, the guidelines would be inapplicable."  <u>Desrosiers</u>, 846 F.2d at 577-78.  The ALJ is then

9   required to use a vocational expert. <u>Aukland v. Massanari</u>, 257  F. 3d 1033 (9th Cir. 2001).

10          In this case, the ALJ concluded that plaintiff was not disabled at step five of the

11  analysis because although she could not do her past work as a janitor, she could do unskilled

12  light work with certain limitations, based on the grids as a framework for decisionmaking.  (Tr. at

13  22.)  These limitations, as posed in a hypothetical to the vocational expert, were that plaintiff

14  could lift ten pounds frequently and twenty pounds occasionally, she could occasionally climb,

15  balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolding, could do

16  no overhead reaching, but could reach at shoulder level or below without limitation, and would

17  need to be in an indoor temperature controlled environment with no concentrated exposures of

18  fumes, odors, dusts and smoke.  The hypothetical further limited plaintiff to simple one/two step

19  tasks.  (<u>Id.</u> at 42-43.)

20          It is clear that all of these exertional and non-exertional limitations, taken

21  together, are significant enough to require departure from the grids and use of vocational

22  testimony.  The vocational expert testified that with these limitations, plaintiff could do the jobs

23  of electronics worker or bindery machine feeder.  (<u>Id.</u> at 43-44.)  Because these jobs exist in

24  significant numbers in the national economy, the ALJ concluded that plaintiff was not disabled

25  within the framework of Rule 202.13 of the grids.

26  \\\\

1    Plaintiff contends that the ALJ should have used Rule 201.12 of the grids based

2    on sedentary work.  As plaintiff was closely approaching advanced age,[10] and had no transferable

3    skills, she would be found disabled under this Rule.  The question then, is whether the light work

4    grids or the sedentary work grids should apply as a framework.  20 CFR Pt. 404, Subpt. P, App.

5    2, § 200.00(e)(2)  provides in part:

6    [W]here an individual has an impairment or combination of
     impairments resulting in both strength limitations and
7    nonexertional limitations, the rules in this subpart are considered in
     determining first whether a finding of disabled may be possible
8    based on the strength limitations alone and, if not, the rule(s)
     reflecting the individual's *maximum* residual strength capabilities,
9    age, education, and work experience provide a framework for
     consideration of how much the individual's work capability is
10   further diminished in terms of any types of jobs that would be
     contraindicated by the non-exertional limitations.

11

12   (Id.) (emphasis added).

13   Under this directive, the grids for light work must be used as a framework because

14   they more accurately reflect plaintiff's *maximum* residual strength capabilities.  It is readily

15   apparent that the light work grids are the proper ones because even with all the aforementioned

16   limitations, the vocational expert was able to determine specific jobs plaintiff could do; whereas

17   the sedentary work grids would have resulted in a finding of disability without regard to any non-

18   exertional limitations.

19   Moreover, the ALJ's decision to reject Dr. Heard's much more limiting RFC was

20   proper, and therefore substantial evidence supports the ALJ's reliance on the vocational expert's

21   hypothetical with Rule 202.13 (light work) used as a framework.

22   E.  Hypothetical to the Vocational Expert

23   Plaintiff's final argument is that the ALJ erred in posing an incomplete

24   hypothetical to the vocational expert which did not accurately reflect plaintiff's condition, and by

25

26   [10]  Plaintiff turned 50 in 2008, so Rules 202.13 (for light work) and 201.12 (for sedentary work) apply.

1   disregarding the expert's answer when questioned about plaintiff's actual condition.

2           Hypothetical questions posed to a vocational expert must include all the

3   substantial, supported physical and mental functional limitations of the particular claimant.

4   Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

5   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

6   expert's testimony as to available jobs in the national economy has no evidentiary value.

7   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

8   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

9   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

10  limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

11  other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

12  based on alternate interpretations of the evidence, substantial evidence must support the

13  hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen,

14  849 F.2d 418, 422 (9th Cir. 1988).[11]

15          Plaintiff urges the court to consider the RFC assessment completed by Dr. Heard

16  and a hypothetical based on that assessment, as posed by plaintiff's attorney.  Based on that

17  assessment, plaintiff contends that there are no jobs in significant numbers that she could

18  perform.  As the court found the ALJ's reliance on certain opinions and rejection of plaintiff's

19  subjective testimony was proper, he was not required to include limitations reflected by that

20  rejected evidence in his hypothetical.  Osenbrock v. Apfel, 240 F.3d 1157, 1164 (9th Cir. 2001).

21          The ALJ satisfactorily addressed plaintiff's limitations based on the hypothetical

22  that reflected the evidence of record.

23  \\\\

24

25      [11]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a
    hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d
    747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial

26  evidence or reject them if they are not.  Id. at 756-757.

1  <u>CONCLUSION</u>

2          For the reasons stated herein, IT IS ORDERED that: plaintiff's Motion for

3  Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is

4  granted, and judgment is entered for the Commissioner.

5  DATED: December 21, 2011

                                        /s/ Gregory G. Hollows
6                                       UNITED STATES MAGISTRATE JUDGE

7  GGH/076
   Bybee3264.ss.wpd
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26